IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiffs,<br><br><br>vs.<br><br><br>RYAN RALICKE REED,<br><br>        Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:14-cr-00062-TC |

Defendant Ryan Reed filed a motion to suppress "all physical evidence found in his vehicle, and all statements made by [Mr. Reed] after the illegal stop of his vehicle." (Mot. to Suppress at 1, Dkt. No. 27.)   On January 26, 2014, Sergeant Chamberlin Neff stopped Mr. Reed for speeding.  Based on evidence found in his car during the stop, Mr. Reed was arrested and indicted for possession of MDMA with intent to distribute.  According to Mr. Reed, the traffic stop was not supported by reasonable suspicion or probable cause because Sergeant Neff made an inaccurate visual speed estimate and used his radar unit incorrectly.

On November 12, 2014, the court held an initial evidentiary hearing where Sergeant Neff testified, after which the parties submitted proposed findings of fact and conclusions of law.  But at the hearing, Mr. Reed's counsel indicated that Mr. Reed had hired an expert to review issues related to Sergeant Neff's use of radar.[1]  (Hr'g Tr. 6-7, Nov. 12, 2014, Dkt. No. 77 [11/12/14

---

[1] At the November 12, 2014, hearing, Mr. Reed's counsel said he might also argue that Sergeant Neff needed to obtain an electronic warrant. (11/12/14 Tr. 62.)  But this issue was not

Tr.].)  To give Mr. Reed the opportunity to present his expert evidence, the court held a

supplemental evidentiary hearing on March 9, 2015, and heard testimony from Mr. Reed's

expert, Perry Zucker.  The parties filed supplemental briefs after the second hearing.  The court

has reviewed the evidence from both hearings, along with the relevant law and the parties'

briefing.  Based on its review, and for the reasons set forth below, the court DENIES the Motion

to Suppress.

### FINDINGS OF FACT[2]

Sergeant Chamberlin Neff has been a POST-certified[3] trooper with the Utah Highway

Patrol since the beginning of 2006.  (11/12/14 Tr. 9.)  As part of Sergeant Neff's POST training

in early 2006, he participated in a one-week course on how to use radar, visualize speed, and

conduct traffic stops.  (Id. 10-11.)  Sergeant Neff was first certified to operate his radar unit in

January 2006, and his certification was current through the date of the traffic stop in this case.

(Id. 12-13.)  In addition to the initial training of its troopers, the Utah Highway Patrol conducts

in-service training each year, which in part "update[s] troopers on radar and lidar procedures,

policies and implementations on how to use their radar and lidar."  (Id. 11.)  And every three

years, troopers are required to re-certify for the operation of radar.  (Id.)

---

raised during the supplemental hearing or in Mr. Reed's briefs.  As a result, the court will not
consider the electronic warrant issue. In addition, the court will not consider the propriety of the
dog search of Mr. Reed's car because the parties have not raised the issue at this time.  The
court's analysis is limited to whether Sergeant Neff had probable cause or reasonable suspicion
to stop Mr. Reed for speeding, the only questions presented to the court.

[2] The facts are taken from the witnesses' testimony, the video tape of the traffic stop, and
other evidence admitted during the two evidentiary hearings held on November 12, 2014, and
March 9, 2015.

[3] POST stands for "Police Officer Standards and Training."

In his nine years as a trooper, Sergeant Neff has made approximately 13,000 traffic stops, at least a quarter of which dealt with speed.  (Id. 16.)  Sergeant Neff has never had issues with his radar certification, radar antennas, radar maintenance, or anything related to radar.  (Id. 18.)  On January 26, 2014, at the beginning of his shift, Sergeant Neff tested his radar unit with tuning forks and did not see anything to suggest that the unit was not working properly. (Id. 23, 27.)

Later that day, at about 3:00 p.m., Sergeant Neff was parked on I-80 in the median at 7200 West, watching traffic headed in both directions but primarily looking at traffic headed east. (Id. 30.)  It was a clear Sunday afternoon with little traffic, and this particular stretch of I-80 is very flat and straight.  (Id. 34.)

Sergeant Neff began focusing on a silver Chevrolet Malibu (Mr. Reed's car) when the car reached the off-ramp for the 7200 West exit.  (Id. 35.)  Sergeant Neff initially thought the car may be speeding and verified that belief with a visual speed estimation method, which he described as follows:

> So basically, with visually estimating speed, you pick two fixed objects or two fixed landmarks, whatever you would like to use in an area that you are familiar with, know the distance and know typically how long it would take someone that is driving the speed limit to cross from one point, known point, to another known point.

(Id. 15, 35.)  In this particular section of I-80, Sergeant Neff used the off-ramp for 7200 West and the actual pillar for the overpass at 7200 West as his two known points.  (Id. 16.)  Based on his experience in patrolling the area, Sergeant Neff testified that the two points are about 2,000 feet apart and it should take about seventeen seconds to drive that distance going the speed limit of 75 mph.  (Id.)  Counting the seconds it took Mr. Reed to travel between the two points, Sergeant Neff concluded that Mr. Reed's car was traveling approximately 80 mph.  (Id. 36.)

Sergeant Neff made a U-turn and pulled onto the highway to follow and get a radar reading from Mr. Reed's car.  (Id. 37.)  As Sergeant Neff explained, "I drove up behind the vehicle as fast as I could, to catch up to the vehicle to make sure that there was as less [sic] of interference as possible and to be able to get a better reading from the radar."  (Id. 40.)  Sergeant Neff activated the "moving setting" on his radar, verified the speed of his patrol vehicle, used his radar unit to get "a clear lock" on Mr. Reed's car, and pushed the hold button on his unit, which confirmed that Mr. Reed's car was traveling 75 mph.  (Id. 40-42.)  At the point where the radar clocked Mr. Reed's speed at 75 mph, the speed limit had changed from 75 mph to 65 mph.  (Id. 42, 43-44.)  The change in speed limit occurs shortly after passing 7200 West heading eastbound.[4]  (See Video Recording of Traffic Stop (Govt.'s Ex. 1) [Traffic Stop Video]; Perry Zucker Video of Scene (Def. Ex. C) [Zucker Video].)

After obtaining his radar reading, Sergeant Neff caught up and "paralleled next to the Malibu," meaning he drove next to it and matched Mr. Reed's speed as closely as possible.  (Id. 47.)  At this point, Sergeant Neff noticed the two vehicles were traveling about 70 mph in a 65-mph zone.  (Id. 47-48.)  The video recorded by Sergeant Neff's dashboard camera confirms a speed of about 70 mph when Sergeant Neff pulled his vehicle alongside Mr. Reed's car.  (Traffic

---

[4] A video camera in Sergeant Neff's patrol vehicle recorded the stop beginning right before Sergeant Neff enters the 65-mph zone and continuing through the conclusion of the search of Mr. Reed's car.  (See Traffic Stop Video, Govt. Ex. 1.)  Mr. Reed and his expert argue that the video may have been altered because the footage should have begun thirty seconds before Sergeant Neff reached 100 mph, and Sergeant Neff's vehicle was traveling over 100 mph when the video begins.  Although Sergeant Neff testified that the video normally captures thirty seconds of footage before he either activates his lights or reaches speeds of 100 mph or more, there is nothing in the evidence that would establish or even suggest any intentional alteration of the video by Sergeant Neff or the government.

Stop Video.)  After pacing Mr. Reed's car, Trooper Neff slowed his vehicle, pulled behind Mr.

Reed, and turned on his lights.  (Id.; 11/12/14 Tr. 49.)  Mr. Reed slowed down and pulled over to

the side of road. (11/12/14 Tr. 49.)

Sergeant Neff approached Mr. Reed's car and explained that the speed limit had changed

from 75 mph to 65 mph.  (Id. 55, 57.)  Mr. Reed responded that he had just noticed the change.

(Id. 55, 57.)  Sergeant Neff resumed the conversation after Mr. Reed exited his car, explaining

the speed limit was 65 mph from that point and continuing throughout the Salt Lake Valley. (Id.

59.)  In response, Mr. Reed said, "My bad." (Id.; Traffic Stop Video.)

Sergeant Neff later brought out his dog, which indicated an odor of narcotics coming

from Mr. Reed's car.  (11/12/14 Tr. 60.)  During the subsequent search of Mr. Reed's car,

Sergeant Neff found "8.7 pounds of field-tested-positive MDMA, or ecstasy."  (Id.)

In the supplemental hearing on the motion to suppress, Mr. Reed introduced testimony

and evidence through his expert witness, Perry Zucker.  Mr. Zucker is an engineer who has been

employed as an accident investigator for over twenty years.  (Hr'g Tr. 7, Mar. 9, 2015, Dkt. No.

75 [3/9/15 Tr.].)  He has an Associate degree and a Bachelor's degree in electrical and

mechanical engineering, and he is working on a Master's degree in electrical and mechanical

engineering.  (Id.)  From 1991 to 1992, Mr. Zucker also worked for the New York City Police

Department as a trainer on radar and accident investigations.  (Id. at 7-8, 63.)  He has worked on

over 2,000 cases and testified in court over 500 times.  (Id. 8.)

Before testifying in this case, Mr. Zucker reviewed the police report, the transcript of

Sergent Neff's testimony, and the video recording of the traffic stop.  (Id. 8-9.)  In addition, Mr.

Zucker went to the scene of the stop and took his own video, photographs, and measurements.

Based on his review of the case, Mr. Zucker testified that Sergeant Neff's visual speed estimate was incorrect because Sergeant Neff used inaccurate distance measurements.  (Id. 18-23.)  Mr. Zucker measured from the 7200 West overpass to the Exit 111 sign, a distance of about 1,500 feet.  (Id. 19.)  Based on this distance, Mr. Zucker concluded that Mr. Reed was traveling at about 60 mph, rather than the 80 mph that Sergeant Neff estimated.  (Id. 30-31.)  Although he challenged Sergeant Neff's estimate, Mr. Zucker agreed that a person can become very skilled at visually estimating motor vehicle speeds and can rely on visual estimates, if the person is properly trained and if the estimates are done properly.  (Id. 75-77.)

Mr. Zucker further opined that Sergeant Neff improperly calibrated his radar unit because he only performed the tuning forks test and did not perform a light test or internal circuit test.  (Id. 41.)  Without the two additional tests, Mr. Zucker testified that "we really don't know" whether the radar reading was accurate.  (Id. 47, 83.)  Mr. Zucker further stated that interference could have affected the accuracy of the radar reading.  (Id.)  Finally, Mr. Zucker questioned Sergeant Neff's testimony that he was traveling 70 mph when pacing Mr. Reed's car because there is a delay in the GPS used to record speed for the dashboard camera.  (Id. 59-61, 85.)

## CONCLUSIONS OF LAW

Advocating for the application of a probable cause standard, Mr. Reed asks the court to "exclude all evidence gathered subsequent to the traffic stop, as there was no probable cause for the stop, and the evidence gathered thereafter was illegally obtained."  (Mem. in Supp. of Mot. At 1, Dkt. No. 28.)  Based on a close review of the case law, the court concludes that a reasonable suspicion standard applies, and Sergeant Neff had reasonable suspicion to stop Mr. Reed for speeding.

6

I.        **Standard for Traffic Stops**

The court must "conduct a two-step inquiry when determining the constitutionality of a traffic stop, considering first whether the officer's action was justified at its inception, and second, whether it was reasonably related in scope to the circumstances that justified the interference in the first place." United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005). Because Mr. Reed's arguments relate solely to the first prong, the court limits its analysis to whether the traffic stop was justified at its inception.

"To determine the initial validity of a traffic stop, we ask whether the stop was 'objectively justified.'" United States v. DeGasso, 369 F.3d 1139, 1143 (10th Cir. 2004) (quoting United States v. Botero-Ospina, 71 F.3d 783, 788 (10th Cir. 1995) (en banc)). "Generally, a routine stop is objectively justified when probable cause or reasonable articulable suspicion exists to believe a traffic violation has occurred." Id.   While Mr. Reed argues that the higher standard of probable cause should apply, the Tenth Circuit has rejected this position.

In United States v. Callarman, 273 F.3d 1284 (10th Cir. 2001), the court specifically addressed the argument "that a traffic stop must be supported by probable cause rather than reasonable suspicion." Id. at 1286.  Although the defendant in Callarman cited Supreme Court case law in support of his position that probable cause was needed to justify a traffic stop, the court explained, "While these cases indicate that probable cause is a sufficient ground for a stop, none of them indicates that is necessary for a stop.  Other Supreme Court and Tenth Circuit cases have held that reasonable articulable suspicion is also sufficient grounds to justify a stop." Id. at 1286.  "While either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary." Id. at 1287 (emphasis added).

Despite this case law contradicting his position, Mr. Reed maintains that an officer must have probable cause for a stop involving a moving traffic violation which the officer observes. But the Tenth Circuit did not make this distinction in Callarman or in any other case.  Rather, the court's "sole inquiry in traffic stop cases is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." Id. (quotations omitted).

## II.     Reasonable Suspicion to Stop Mr. Reed

To establish reasonable suspicion, "an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009) (quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  The court looks at the totality of the circumstances when deciding whether reasonable suspicion exists.  United States v. Harmon, 742 F.3d 451, 456 (10th Cir. 2014).

Applying these standards, the Tenth Circuit has found that a traffic stop is justified under the reasonable suspicion standard where the officer personally observes a violation.  See Winder, 557 F.3d at 1135 ("Our precedents leave no room to doubt the validity of a traffic stop based on an observed traffic violation.  Observed traffic violations necessarily 'afford the quantum of individualized suspicion necessary to ensure that police discretion is sufficiently constrained.'" (quoting Whren v. United States, 517 U.S. 806, 817-18 (1996)).  Here, Sergeant Neff saw Mr. Reed speeding and confirmed the speed at multiple points and by multiple methods.

First, Sergeant Neff visually estimated Mr. Reed's speed.  Sergeant Neff initially saw Mr. Reed's car as it was reaching the off-ramp for the 7200 West exit (Exit 111) on eastbound I-80.

8

Sergeant Neff suspected Mr. Reed was speeding and used a method he learned in his POST training: he counted the seconds that it took Mr. Reed to travel between two known points, the 7200 West off-ramp and the pillar for the overpass at 7200 West. Based on his count, Sergeant Neff estimated that Mr. Reed was traveling 80 mph in a 75-mph zone.

This visual estimate alone may have given Sergeant Neff sufficient reasonable suspicion to stop Mr. Reed for speeding. Indeed, "[i]t's long been the case that an officer's visual estimation can supply probable cause to support a traffic stop for speeding in appropriate circumstances." United States v. Ludwig, 641 F.3d 1243, 1247 (10th Cir. 2011). In Ludwig, the district court found the trooper's visual estimate credible where the trooper's view was clear and he "possessed 15 years' experience as a highway patrolman watching cars and estimating speeds." Id. With those facts, the Tenth Circuit concluded that the necessary "appropriate circumstances" existed to justify the stop based on a visual estimate.

Here, Sergeant Neff had a clear view of Mr. Reed's car because traffic was light and the relevant stretch of I-80 is flat and straight. Moreover, Sergeant Neff has been a trooper for over nine years and in that time has made approximately 13,000 traffic stops, at least a quarter of which dealt with speed.[5] As in Ludwig, the conditions of Sergeant Neff's stop, combined with his experience, lend credibility to his visual estimation.

Mr. Reed, however, contends that Sergeant Neff's estimate was inaccurate. Mr. Reed's

---

[5] At the time of the stop in this case, Sergeant Neff had been a trooper for eight years, not nine, but the court does not find the difference significant. Although he had worked an extra year when he testified at the evidentiary hearing, the evidence still shows that at the time of the stop, Sergeant Neff had extensive experience with traffic stops for speeding violations.

expert, Perry Zucker, testified that he measured from the 7200 West overpass to the Exit 111 sign, and his measurements showed a distance of approximately 1,500 feet, about 500 feet less than Sergeant Neff's measurement. With this discrepancy, Mr. Zucker opined that Sergeant Neff's visual speed estimate must have been wrong because he used an incorrect distance. Mr. Zucker also testified that, even when he used 2,000 feet as the distance for calculating speed, the speed formula shows that Mr. Reed would have been traveling about 70 mph.

For at least two reasons, Mr. Zucker's testimony fails to show that Sergeant Neff lacked reasonable suspicion to stop Mr. Reed for speeding. First, Mr. Zucker assumed that Sergeant Neff used the 7200 West overpass and the Exit 111 sign to measure distance. But Sergeant Neff did not testify that he used the exit sign as a landmark. He testified that he measured from the pillar at the overpass to the actual off-ramp at Exit 111. So it is not clear that Mr. Zucker's opinion is based on the same underlying data that Sergeant Neff used for his visual estimate.

But even if the court assumes that Sergeant Neff miscalculated the distance for his speed estimate, "[a] traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment.'" Tibbetts, 396 F.3d at 1138 (quoting United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2005)). Here, Sergeant Neff used a method that he learned in his training to estimate distance in an area where he frequently monitors traffic. Even if he was incorrect about the distance between two points, the inaccuracy does not render his mistake unreasonable. Moreover, even if Mr. Reed was not actually speeding when Sergeant Neff stopped him, Sergeant Neff need only establish reasonable suspicion of speeding, not an actual violation. Id. at 1137 ("[T]he district court must determine whether [the officer] had reasonable suspicion of a violation, not whether there was actually a violation.").

10

In addition to challenging the factual basis for Sergeant Neff's visual estimate, Mr. Reed cites a Fourth Circuit case, United States v. Sowards, 690 F.3d 583 (4th Cir. 2012), to argue that the government cannot rely on Sergeant Neff's estimate.  In Sowards, the Fourth Circuit reversed the district court's denial of a motion to suppress where the traffic stop was based solely on the trooper's visual estimate that the defendant was going 75 mph in a 70-mph zone.  Id. at 585.  The court declined to give "blanket approval for the proposition that an officer's visual speed estimate, in and of itself, will always suffice as a basis for probable cause to initiate a traffic stop."  Id. at 591.  Rather, "the reasonableness of an officer's visual speed estimate depends, in the first instance, on whether a vehicle's speed is estimated to be in significant excess or slight excess of the legal speed limit.  If slight, then additional indicia of reliability are necessary to support the reasonableness of the officer's visual estimate."  Id. at 591.[6]  The court found that the stop lacked any indicia of reliability because the trooper "did not attempt to verify, or otherwise corroborate, his visual speed estimate with his radar unit [and] he did not attempt to pace Sowards's vehicle with his patrol car to gauge the speed."  Id. at 585.  In addition, the trooper had no training in visually estimating speeds and could not explain his estimation method; he merely stated that, based on his experience, his estimate was accurate.  Id. at 586-87, 588-89.

_____

[6] As explained above, the Tenth Circuit in Ludwig differed from the Fourth Circuit on this issue and did not analyze the degree to which the defendant exceeded the speed limit.  The Tenth Circuit held that, in appropriate circumstances, a visual estimate may justify a traffic stop for speeding.  The court in Sowards recognized the Ludwig decision and concluded that appropriate circumstances must exist before a visual estimate may justify a stop.  The court stated, "[A]t a minimum there must be sufficient indicia of reliability for a court to credit as reasonable an officer's visual estimate of speed."  Sowards, 690 F.3d at 591.  In this case, the court has found the "appropriate circumstances" required by Ludwig.  But even if this court were to follow Sowards, the facts here are distinguishable primarily because Sergeant Neff did not rely exclusively on his visual estimate.

The facts here are easily distinguishable from those in Sowards.  As discussed above, Sergeant Neff visually estimated Mr. Reed's speed using a method that he learned in his formal POST training and that he described at the first suppression hearing.  Most significantly, Sergeant Neff did not rely exclusively on his visual estimate.  He used two additional methods to confirm his belief that Mr. Reed was speeding.

After visually estimating that Mr. Reed was driving 80 mph in a 75-mph zone, Sergeant Neff made a U-turn and pulled onto the highway to follow Mr. Reed's car. As Sergeant Neff explained, "I drove up behind the vehicle as fast as I could, to catch up to the vehicle to make sure that there was as less [sic] of interference as possible and to be able to get a better reading from the radar."  (11/12/14 Tr. 40.)  After getting closer to Mr. Reed and activating the "moving setting" on his radar unit, Sergeant Neff used his radar to clock Mr. Reed's speed at 75 mph.  By this time, the speed limit had decreased to 65 mph.  Mr. Reed argues that Sergeant Neff failed to calibrate his radar unit correctly and may have encountered interference when obtaining his reading.  But Sergeant Neff testified that he drove closer to Mr. Reed to limit interference.  In addition, he calibrated the radar unit using tuning forks on the morning of the stop.  Sergeant Neff further testified that he received regular training on the use of radar and has never had any radar-related issues.  Beyond the speculation that additional calibration tests may have made a reading more reliable, Mr. Reed has not offered any evidence to show that Sergeant Neff operated his radar unit incorrectly.  And the radar unit confirmed that Mr. Reed was driving 75 mph in a 65-mph zone.

After obtaining his radar reading, Sergeant Neff continued to pursue Mr. Reed until he caught up and drove parallel to Mr. Reed's vehicle to gauge the speed.  According to the video

12

recorded by Sergeant Neff's dashboard camera, Sergeant Neff's vehicle was traveling at least 70 mph when it was driving parallel to Mr. Reed's car.  Although Mr. Reed contends that there is a delay in the video, Sergeant Neff also testified that when he pulled alongside Mr. Reed, he personally noticed the two vehicles were traveling about 70 mph in a 65-mph zone.

In sum, Sergeant Neff used three different methods to confirm that Mr. Reed was speeding.  He visually estimated that Mr. Reed was driving 80 mph in a 75-mph zone.  And after Mr. Reed entered the 65-mph zone, Sergeant Neff used a radar unit to clock Mr. Reed's speed at 75 mph and then paced Mr. Reed's car at a speed of 70 mph.  Even if the court assumes certain flaws, each of the methods used by Sergeant Neff provided an independent basis for a speeding violation.  In addition, when Sergeant Neff told Mr. Reed that he had entered a 65-mph zone that would continue throughout the Salt Lake Valley, Mr. Reed said, "My bad," suggesting that he knew he was speeding. Under these circumstances, there was much more than "'some minimal level of objective justification' for making the stop."  Winder, 557 F.3d at 1134 (quoting Vercher, 358 F.3d at 1261).  Sergeant Neff had ample evidence to believe that Mr. Reed was speeding.  As a result, he had reasonable suspicion to justify the stop.

## ORDER

For the foregoing reasons, the Motion to Suppress (Dkt. No. 27) is DENIED.

DATED this 14th day of April, 2015.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge

13