Rudy J. Bautista (8636)
BAUTISTA, OVERSON & STEWART, P.C.
675 East 2100 South, Suite 270
Salt Lake City, UT 84106
Telephone: (801) 938-8850
Mobile: (801) 232-5311
Email: rudy@boslaw.com

*Attorney for Defendant*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br> vs. <br> RYAN RALICKE REED, <br><br> Defendant. | SUPPLEMENTAL SENTENCING MEMORANDUM <br><br> Case No. 2:14-CR-062 TC <br><br> HONORABLE TENA CAMPBELL |

Ryan Ralicke Reed, through counsel of record, Rudy J. Bautista, respectfully submits the following Supplemental Sentencing Memorandum.

INTRODUCTION

Ryan Reed respectfully submits this Supplemental Sentencing Memorandum in advance of his sentencing, currently scheduled for September 25, 2015. An additional Sentencing Memorandum, concurrently filed, addresses certain statutory factors and Mr. Reed's personal characteristics. This Supplemental Sentencing Memorandum, however, addresses the appropriateness of adhering to the empirically flawed U.S. Sentencing Guideline for MDMA (hereinafter "MDMA Guideline").

The MDMA Guideline is scientifically unsupportable and, as a result, prescribes

sentencing ranges that are unfairly severe. Instead, this Court should determine an appropriate initial sentencing range for Mr. Reed that is based on consideration of the scientifically-documented properties and harms of MDMA.

Counsel submits this memorandum based upon the United States Supreme Court decision in *Kimbrough v. United States*, 552 U.S. 85 (2007), which allows this Court discretion to vary from Guidelines that lack an empirical basis.

## STATEMENT OF FACTS

1. On January 26, 2014, a Utah Highway Patrol Trooper initiated a stop on Ryan's vehicle for speeding.[1]

2. After an extended investigation, and through a K9 indicating drugs in the vehicle, Ryan was arrested and subsequent to the arrest, Ryan's vehicle was searched.[2]

3. After the search, approximately 8.7 pounds Methylenedioxymethamphetamine (MDMA) was found vacuum-sealed in three separate packages.[3]

4. During a police interview that occurred the same day, the defendant explained that he traveled to California to purchase MDMA and that he had purchased it with money that he and his friends had put together. He explained that he had done so five or six previous times and that he was paid 5 percent of the proceeds that others sold and $400 an ounce for what he sold.[4]

---

[1] *See* Presentence Report ("PSR") at ¶6.
[2] *Id*. at ¶6-7.
[3] *Id*. at ¶8.
[4] *Id*. at ¶9

5. Ryan also provided detectives with detailed information about where he picked up the MDMA and where he was supposed to drop the dugs once he returned to Colorado. He provided detectives with names and details of agreements as well.[5]

6. Ryan was taken into custody on January 26, 2014 and was not released until a hearing before the Honorable Dustin B. Pead when he ordered Ryan released to pretrial supervision with conditions. Ryan has complied with all terms of his release.[6]

7. Ryan is 23 years old.  He is not married but in a committed relationship with Kayla O'Hara.[7]

8. Ryan has a close relationship with both parents, which both reside in Colorado.[8]

9. Ryan has worked for Stroller Depot in Highlands Ranch, Colorado for the last year making $17.00 per hour. Prior to that he only had a short period of unemployment after his brief incarceration in this case.[9]

10. Ryan attended University of Colorado from 2010-2014. He accumulated 70 credits in his major of Quantitative Economics.[10]

11. The Presentence Report, as corrected, states the base offense level is 30.  Ryan's criminal history score is a 0 which puts him at criminal history category I.[11]

12. Because Ryan is eligible for Safety Valve and due to his acceptance of responsibility, his adjusted score is 25, which equates to a guideline sentence of 57 to 71 months.

---

[5] *Id*. at ¶15.
[6] *Id*. at ¶3.
[7] *Id*. at ¶36.
[8] *Id*. at ¶35.
[9] *Id*. at ¶42.
[10] *Id*. at ¶41.
[11] *Id*. at ¶¶17, 31.

ARGUMENT

I.    THE MDMA GUIDELINE LACKS AN EMPIRICAL BASIS BECAUSE IT IS BASED ON NOW-DISCREDITED SCIENCE.

When the Sentencing Commission created the MDMA Guideline in 2001, it crafted a penalty structure based on the conclusion that MDMA was more harmful than cocaine and what it viewed as the pharmacological and physiological harms of the drug. It was in this context that the Commission amended the Drug Equivalency Tables in U.S.S.G. 2D1.1 to increase sentences for MDMA dramatically.[12]

Before the amendments, one gram of MDMA was treated as equivalent to 35 grams of marijuana; the 2001 amendment set one gram of MDMA equal to 500 grams of marijuana.[13] As a result, the length of the average MDMA sentence more than doubled.[14] And as a result of the Commission's conclusion that MDMA is more harmful than cocaine, the Commission set one gram of MDMA equivalent to 2.5 grams of cocaine for purposes of sentencing.[15]

With the benefit of hindsight, it is clear that the Commission's conclusions about the harmfulness of MDMA — and in particular the Commission's conclusion that MDMA is more harmful than cocaine — are simply incorrect and do not comport with empirical evidence and national experience.

*Medical Data*

According to 2006-2007 data, two to three times as many Americans abuse cocaine, as is MDMA.[16] In 2007, similarly, approximately 5.7 million people reported using cocaine within the

---

[12] U.S. Sentencing Comm'n, Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Amendments 5-6 (2001) [hereinafter "MDMA Report"].
[13] *Id*.
[14] *See id*. at 6 (noting increase in average sentence from just under 3 years to just over 6 years).
[15] *See id*. (setting one gram of MDMA equivalent to 500 grams of marijuana, and noting one gram of cocaine is equivalent to 200 grams of marijuana).
[16] U.S. Dep't of Health & Human Servs., Substance Abuse & Mental Health Servs. Admin., Nat'l Survey on Drug Use and Health [hereinafter "NSDUH"], available at http://www.oas.samhsa.gov/nsduh.htm.

previous year; the number of people reporting using ecstasy during the same time period was once again approximately 2.1 million.[17] In 2006, cocaine was the cause of approximately thirty-three times as many emergency room visits as MDMA.[18] In 2007, cocaine accounted for forty-two times as many emergency room visits as MDMA.[19]

Another simple way to put the two drugs in perspective is to note that cocaine, which accounts for almost 30 percent of all drug-related visits to the emergency room (including visits stemming from legal drugs as well as illegal drugs), is the leading cause of drug-related visits to the emergency room, whereas MDMA leads to less than 1% of drug-related visits.[20] In fact, more than twice as many people are hospitalized annually because of adverse reactions to acetaminophen (the active ingredient in Tylenol) as MDMA ingestion.[21]

*Expert opinion*

Three European surveys of scientific and health-policy experts also support the conclusion that MDMA is less harmful than cocaine. In the prominent British medical journal *The Lancet*, two studies assessed the relative harmfulness of twenty substances of abuse based on the harmfulness of the drug to the individual user and to society. MDMA ranked among the bottom four out of twenty in both studies, whereas cocaine ranked among the top five in both studies.[22] Marijuana and ketamine (which the Guidelines treat as equivalent to marijuana for

---

[17] *See id.*

[18] *See* U.S. Dep't of Health & Human Servs., Substance Abuse & Mental Health Services Admin., Drug Abuse Warning Network 2006: Nat'l Estimates of Drug-Related Emergency Department Visits [hereinafter "DAWN 2006"] 20 (2008), available at https://dawninfo.samhsa.gov/files/ED2006/DAWN2k6ED.pdf.

[19] *See* U.S. Dep't of Health & Human Servs., Substance Abuse and Mental Health Services Admin., Drug Abuse Warning Network 2007: Nat'l Estimates of Drug-Related Emergency Department Visits 22 [hereinafter "DAWN 2007"] (2010), available at https://dawninfo.samhsa.gov/files/ED2007/DAWN2k7ED.pdf.

[20] DAWN 2007, at 22.

[21] *Compare, Ban is Advised on Top Two Pills for Pain Relief*, N.Y. Times, Jul. 1, 2009, at A1 (42,000 hospitalized for acetaminophen annually), *with* DAWN 2007, at 22 (12,748 hospitalized for MDMA in 2007), and DAWN 2006, at 20 (16,749 hospitalized for MDMA in 2006).

[22] *See* Nutt et al., Development of a rational scale to assess the harm of drugs of potential misuse, 369 The Lancet 1047, 1051 (2007); Nutt et al., Drug harms in the UK: a multicriteria decision analysis, 376 The Lancet 1558, 1561 (2010).

sentencing purposes[23], also ranked as more harmful than MDMA: marijuana ranged between sixth and eighth, and ketamine ranked eleventh in both studies.[24]

A 2010 study conducted by prominent Dutch researchers arrived at results similar to those published in The Lancet.[25] The Dutch study's aggregate harm scores for cocaine's individual and social harm were almost twice those for MDMA.[26] Powder cocaine was ranked sixth on its list of harmful drugs and MDMA was fourteenth.[27] Marijuana and ketamine were both ranked as more harmful than MDMA.[28]

*Inadequate controls*

To document the purported fact that MDMA is "used compulsively by some" and "may produce dysphoria" (i.e., depression)[29], the Commission cited a paper documenting three case studies.

The subjects of the studies were, respectively, a heavy user of cocaine and marijuana, a heroin user with a family history of schizophrenia, and a PTSD patient who also consumed a bottle of Jack Daniels almost every night.[30] The Commission's reliance on this type of paper for its conclusions illustrates both the underdeveloped state of MDMA research in 2001 and the use of problematic source material by the Commission in setting the current Guideline.

*Inappropriate dosage levels*

Another major flaw in the MDMA research that dominated the scientific discourse a decade ago is the use of inappropriately high doses in animal studies to predict consequences for

---

[23] U.S.S.G. § 2D1.1, app. note 10(E), at 543 (2009).
[24] *See* Nutt 2007, 369 The Lancet at 1049-50; Nutt 2010, 376 The Lancet at 1561.
[25] van Amsterdam et al., Ranking the Harm of Alcohol, Tobacco and Illicit Drugs for the Individual and the Population, 16 Eur. Addiction Research 202, 204 (2010).
[26] *Id*.
[27] *Id*.
[28] *Id*.
[29] MDMA Report, at 18.
[30] MDMA Report, at 18 n. 61 (*citing* Jansen, Ecstasy (MDMA) Dependence, 53 Drug & Alc. Dependence 121-24 (1999)).

human users. Specifically, the Commission's 2001 Report relies on two papers that adhere to the view that monkeys and rats should be given multiples of a normal human dose in order to determine how a human would react to a normal human dose.[31] But the validity of this theory has been repudiated by newer studies that suggest the doses used in early animal studies were far too high.[32] For example, the Commins study cited by the Commission gave rats between 10 and 40 milligrams of MDMA per kilogram of body weight (expressed in scientific terms as "mg/kg").[33] But recent research suggests an appropriate dose would be between 1 and 3 mg/kg.[34]

Thus, the Commission relied on a study giving rats a dose equivalent to between three and forty times a normal human dose. More recent animal studies that have used more moderate dosage or self-administration have found little or no evidence of harm.[35]

*Non-replicable studies*

The Commission also relied on several studies that could not be replicated, or scientists whose work was fraught with methodological problems. For instance, Dr. George Ricaurte, cited and relied upon as "[a] leading researcher in MDMA toxicity studies" in the Commission's 2001 report to Congress[36] had to retract multiple studies after it was discovered that they had not been done with MDMA, but with mislabeled vials of methamphetamine. After

---

[31] *See* MDMA Report, at 9 n.16 (citing Ricaurte et al., (+/-) 3,4-methylenedioxymethamphetamine ('Ecstasy')-induced neurotoxicity: studies in animals, 42 Neuropsychobiology 5-10 (2000), and Commins et al., Biochemical and histological evidence that methylenedioxymethamphetamine (MDMA) is toxic to neurons in the rat brain, 241 J. of Pharm. & Experimental Therapeutics 338-345 (1987)).
[32] *See, e.g.*, Baumann et al., 3,4- Methylenedioxymethamphetamine (MDMA) Neurotoxicity in Rats: A Reappraisal of Past and Present Findings, 189 Psychopharmacology (Berl.) 407, 411 (2007); Green et al., MDMA: On the Translation from Rodent to Human Dosing, 204 Psychopharmacology 375, 375 (2009).
[33] *See* Commins et al., Biochemical and histological evidence that methylenedioxymethamphetamine (MDMA) is toxic to neurons in the rat brain, 241 J. of Pharm. & Experimental Therapeutics 338, 339 (1987).
[34] *See*, e.g., Baumann, 189 Psychopharmacology (Berl.) at 411-13.
[35] *See*, e.g., Fantegrossi et al., Behavioral and Neurochemical Consequences of Long-term Intravenous Selfadministration of MDMA and its Enantiomers by Rhesus Monkeys, 29 Neuropsychopharmacology 1270, 1278-79 (2004); Wang et al., Methylenedioxymethamphetamine Administration to Rats Does Not Decrease Levels of the Serotonin Transporter Protein or Alter its Distribution Between Endosomes and the Plasma Membrane, 314 J. Pharmacol. Exp. Ther. 1002, 1011 (2005).
[36] MDMA Report, at 8.

this error came to light, in 2003 the journal Science retracted a Ricaurte study purporting to show that a single dose of MDMA could cause brain injury.[37] The mislabeled vials corrupted several of Ricaurte's other studies as well, and he was forced to withdraw four other papers.[38] Even scientists Ricaurte named in defense of his work were quoted in the New York Times as saying that "some of his best- known work has nonetheless been 'sloppy' or 'not as methodologically rigorous as you might want.'"[39]

In other areas, the Commission cited research that more recent studies with better technology have called into question. For example, the Commission referred to a study showing loss of serotonin transporters (an important neurotransmitter) "throughout the brain," and for this conclusion the Commission relied on a 1998 brain scan study by McCann and colleagues.[40] But in a 2010 study, Kish and colleagues found that loss of serotonin transporters was much less prevalent than had been thought and, in explicit contrast to the McCann study, noted that the new study "did not find a global, massive reduction of brain [serotonin transporter] binding."[41] A 2009 study suggested that what reduction in serotonin transporters does occur is reversible after users abstain from use — in other words, after users stop using, their brains return to normal.[42]

*Overstated Harms*

Research since 2001 refutes the Commission's conclusions regarding the harms of MDMA. The Commission attributed a variety of harms to MDMA, including memory

---

[37] *See* McNeil, Research on Ecstasy Is Clouded By Errors, N.Y. Times, Dec. 2, 2003 at F1.
[38] *Id*.
[39] *Id*. at F2.
[40] MDMA Report, at 9 & n.18 (*citing* Mathias, NIDA Notes, "Ecstasy" Damages the Brain and Impairs Memory in Humans, Pub. No. 99-3478 (Nov. 1999), in turn *citing* McCann et al., Positron emission tomographic evidence of toxic effect of MDMA ("ecstasy") on brain serotonin neurons in human beings, 352 The Lancet 1433 (1998)).
[41] Kish et al., Decreased cerebral cortical serotonin transporter binding in ecstasy users: a positron emission tomography/[11C]DASB and structural brain imaging study, 133 Brain 1779, 1791 (2010).
[42] Selveraj et al., Brain serotonin transporter binding in former users of MDMA ('ecstasy'), 194 Brit. J. of Psych. 355, 357 (2009).

impairment, increases in heart rate and body temperature, and even death.[43] In the years since the Commission's 2001 Report, memory effects among MDMA users have been shown to be negligible or moderate, with users testing well within normal limits.[44]

A 2009 meta-analysis by Rogers and colleagues, which synthesized the results of hundreds of MDMA studies, found that the effects of MDMA on memory, though statistically significant, were nonetheless "small," with the mean scores of users falling within normal ranges.[45] The heart rate and temperature increases associated with MDMA use are minor (unlike the cardiovascular effects of cocaine) and are usually no greater than the increases associated with moderate exercise.[46] Controlled administration of MDMA to human subjects in studies examining the therapeutic effects of MDMA have resulted in no serious adverse reactions among study participants.[47] As the 2009 Rogers meta-analysis summarizes, what deficits do exist among MDMA users are "unlikely" to "significantly impair the average ecstasy user's everyday functional or quality of life."[48]

Finally, deaths from MDMA are quite rare: one British study examining deaths over a ten-year period found approximately 10 deaths per year attributable to MDMA use alone.[49] This table, which covers mortality data for a ten-year period, found 104 "deaths where MDMA was identified on its own" as the cause of death.[50] This category is to be distinguished from the number at the top of the table, 605 deaths, which includes all individuals who had MDMA in

---

[43] MDMA Report, at 7, 9.
[44] *See, e.g.*, Jager et al., Incidental Use of Ecstasy: No Evidence for Harmful Effects on Cognitive Brain Function in a Prospective fMRI Study, 193(3) Psychopharmacology (Berl.) 403, 403 (2007).
[45] Rogers et al., The harmful health effects of recreational ecstasy: a systematic review of observational evidence, Health Tech. Assessment, Jan. 2009, at xi.
[46] Jerome, (+/-)-3,4-methylenedioxymethamphetamine (MDMA, "Ecstasy") Investigator's Brochure 12 (2007).
[47] *Id*. at 17-20.
[48] Rogers et al., The harmful health effects of recreational ecstasy: a systematic review of observational evidence, Health Tech. Assessment, Jan. 2009, at xii.
[49] *See* Schifano et al., Overview of Amphetamine-Type Stimulant Mortality Data — UK, 1997-2007, 61 Neuropsychobiology 122, 125 tbl. 1 (2010).
[50] *Id*.

their systems at the time of death.[51] This represents, on average, approximately 2 deaths per 100,000 MDMA users from 2001-07, or two thousandths of 1 percent.[52]

*Unjustified Fear*

To the extent the Commission relied on fears of a dramatic rise in youth use of MDMA as compared with cocaine, the trends cited by the Commission have not been borne out in the intervening decade. The Commission listed among its justifications for the current MDMA Guideline the fact that MDMA was heavily marketed to youth and that use began at an early age.[53] One of the Commission's reasons for concluding that MDMA is more harmful than cocaine was that "powder cocaine is not as aggressively marketed to youth in the same manner as MDMA."[54] But the Commission's concern about youth use and youth harm has proved unfounded and the comparison to cocaine inapt.

According to the federally funded "Monitoring the Future" survey by the University of Michigan, the percentage of 12th graders who use MDMA fell by more than half from 2001 to 2009.[55] Additionally, the national experience with MDMA has shown that MDMA does not pose a greater threat to the nation's youth than cocaine does. For example, in 2007 the number of cocaine-related emergency room visits was over four times the number of MDMA-related visits for youths aged twelve to seventeen, and for 18- to 20-year-olds, the number of cocaine-related

---

[51] *Compare id.* at 123 (explaining that the greater figure, "np-SAD" deaths, includes cases in which coroners found the "presence of controlled drugs at post-mortem"), *with id.* at 124 (noting there were 104 cases out of the 605 in which ecstasy was "identified on its own" as the cause of death); see also Ex. 1, N.Y. Hrg. Tr. at 87 (Curran, defense expert) (explaining this distinction).
[52] *See* Schifano, 61 Neuropsychobiology at 128 tbl. 6; *see also* Rogers et al., The harmful health effects of recreational ecstasy: a systematic review of observational evidence, Health Tech. Assessment, Jan. 2009, at xii ("Ecstasy . . . remains a rare cause of death when reported as the sole drug associated with death related to drug use.").
[53] MDMA Report, at 5, 12-14.
[54] *Id.* at 5.
[55] *See* Univ. of Mich., Monitoring the Future: A Continuing Study of American Youth (2009), tbl. 2 at 2 ("Trends in Annual Prevalence of Use of Various Drugs in Grades 8, 10, and 12"), available at http://monitoringthefuture.org/data/09data/pr09t2.pdf.

visits was almost nine times the number than MDMA-related visits[56] — even though the overall usage rate for cocaine among each population was less than twice that of MDMA.[57]

National experience and scientific research in the intervening decade demonstrate that MDMA is less harmful than the Commission and Congress had predicted, and that the current MDMA Guideline sentencing ranges are unduly severe. This Court should therefore exercise its discretion under *Kimbrough v. United States*, 552 U.S. 85 (2007), to vary from the scientifically flawed and unnecessarily harsh MDMA Guideline.

II.  THIS COURT HAS DISCRETION TO VARY DOWNWARD FROM THE OTHERWISE-APPLICABLE GUIDELINE RANGE WHEN THE COMMISSION HAS ABANDONED ITS TRADITIONAL ROLE BY DEVELOPING GUIDELINES THAT LACK AN EMPIRICAL BASIS.

Under *Kimbrough v. United States*, 552 U.S. 85 (2007), this Court has discretion to vary from Guidelines that lack an empirical basis. Like the crack cocaine Guideline at issue in *Kimbrough*, the MDMA Guideline is scientifically unsupportable and, as a result, prescribes sentencing ranges that are unfairly severe. Instead, it should look beyond the faulty data that the Commission relied on in 2001, and determine an appropriate initial sentencing range for Mr. Reed that is based on consideration of the scientifically documented properties and harms of MDMA.[58]

The Supreme Court has held that where a particular Guideline is not based on empirical evidence, it is not an abuse of discretion for a district court to impose an outside-of-Guidelines sentence based solely on broad policy concerns.[59] In *Kimbrough*, the Supreme Court noted, "Congress established the commission to formulate and *constantly refine*

---

[56] *See* DAWN 2007, at 25.
[57] *See* NSDUH, tbls. 1.2A, 1.3A, 1.4A & 1.5A.
[58] As the Court is aware, the Court's final task, after consideration of the applicable Guideline, is to make "an individualized assessment based on the facts presented" in light of the sentencing factors Congress has set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007).
[59] *Kimbrough v. United States*, 552 U.S. 85, 108-10 (2007).

national sentencing standards."[60] The Court has elaborated that "[t]he Commission's work is ongoing. The statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and courts of appeals in that process."[61] Moreover, "[t]he sentencing courts, applying the Guidelines in individual cases may depart (either pursuant to the Guidelines or, since Booker, by imposing a non-guidelines sentence)."[62]

Federal courts have cited *Kimbrough* as authority for policy-based departures from Guidelines for drugs other than crack.[63] In fact, the Supreme Court has implied that its reasoning in *Kimbrough* could apply to all drug Guidelines, since "the Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses."[64] Federal courts even depart from Guidelines for other types of offenses entirely.[65]

In *United States v. McCarthy*,[66] the court rejected the calculations made by the U. S. Sentencing Commission regarding the comparison under the drug equivalency tables, U.S.S.G. § 2D1.1, of each illegal drug to marijuana. In *McCarthy*, the district court disputed the findings of the Commission and held that (1) cocaine is more addictive; (2) MDMA is not more aggressively marketed to youths than cocaine; (3) cocaine causes more violence than MDMA; and (4) MDMA was mistakenly described as a hallucinogen.[67] The district court rejected the 2001 amendments to the drug equivalency table and instead adopted a 200 to 1 ratio of MDMA to

---

[60] *Id*. at 108 (citation and internal quotation marks omitted and emphasis added).
[61] *Rita v. United States*, 551 U.S. 338, 350 (2007).
[62] *Id*.
[63] *See, e.g., United States v. Valdez*, 268 Fed. App'x 293, 297 (5th Cir. 2008) (mem.) (methamphetamine); *United States v. Goodman*, 556 F. Supp. 2d 1002, 1010-11, 1016 (D. Neb. 2008) (methamphetamine); *United States v. Thomas*, 595 F. Supp. 2d 949, 952 (E.D. Wis. 2009) (powder cocaine).
[64] *Gall v. United States*, 552 U.S. 38, 46 n.2 (2007).
[65] *See, e.g., United States v. Cavera*, 550 F.3d 180, 184 (2nd Cir. 2008) (en banc) (arms trafficking); *United States v. Herrera-Zuniga*, 571 F.3d 568, 583, 586 (6th Cir. 2009) (illegal reentry); *United States v. Vanvliet*, 542 F.3d 259, 271 (1st Cir. 2008) (interstate travel with the intent to engage in an illicit sexual act); United States v. Baird, 580 F. Supp. 2d 889, 894-95 (D. Neb. 2008) (child pornography).
[66] No. 09 Cr. 1136, 2011 WL1991146 (S.D.N.Y. May 19, 2011).
[67] 2011 WL1991146 at *1-4.

marijuana, the same as applied to cocaine.[68] Since *McCarthy*, three other trial courts in New York, Florida, and Washington have also rejected the 2001 ratio.[69] Accordingly, this Court should not defer to the findings of the Commission, but instead should make its own determination as to the appropriate offense level and sentence.

III.    THIS COURT SHOULD REJECT THE MDMA GUIDELINES 500:1 RATIO AND INSTEAD ADOPT A MORE APPROPRIATE RATIO.

Mr. Reed has pled guilty to Possession with Intent to Distribute 3, 4 Methylenedioxymethamphetamine (MDMA). Mr. Reed submits that this Court should, after calculating the Guideline sentence, express a policy disagreement with the MDMA Guideline and impose a sentence based on a more appropriate ratio rather than the 500:1 conversion ratio to marijuana.

The PSR uses a weight of 8.7 pounds, which converted to marijuana, equals 1973.13 kg using a 500:1 conversion ratio. Under U.S.S.G. § 2D1.1(c)(10), the base offense level for 1973.13 kg of marijuana is 30.

In the alternative, if this Court expresses a policy disagreement with the Guidelines but uses the 35:1 MDMA-to-marijuana conversion ratio that governed prior to the flawed 2001 MDMA Guideline, the resulting base offense level for 4 kg of MDMA would be that for 140 kg of marijuana, which is level 24.[70] The resulting level, starting at 24 and accounting for the adjustments advised in the PSR, is 19. Since Mr. Reed is in Criminal History Category I, the appropriate sentencing range would be 30 to 37 months.

If the Court uses a marijuana-MDMA ration of 1:200[71], the resulting level, starting at 28

---

[68] *Id*. at *4.
[69] *United States v. Qayyem*, 2012 WL 92287 (S.D.N.Y. Jan. 11, 2012); *United States v. Sanudo*, S.D. Fla., Case Number 11-cr-20559-Seitz; *United States v. Phan*, W.D. Wa., Case Number 2:10-cr-00027-RSM.
[70] *See* U.S.S.G. § 2D1.1(c)(4).
[71] A marijuana-MDMA ratio of 1:200 was adopted in *United States v. McCarthy*, No. 09 Cr. 1136, 2011

and accounting for the adjustments advised in the PSR, is 23. Since Mr. Reed is in Criminal History Category I, the appropriate sentencing range would be 46 to 57 months.

If the Court uses a marijuana-MDMA ratio of 1:1, the resulting level, starting at 10 and accounting for the adjustments advised in the PSR, is 6. Since Mr. Reed is in Criminal History Category I, the appropriate sentencing range would be 0 to 6 months.

The Court should begin with one of the above ranges before making its "individualized assessment based on the facts presented" in light of the sentencing factors Congress has set forth in 18 U.S.C. § 3553(a).[72]

## CONCLUSION

Because the MDMA Guideline promulgated in 2001 and still on the books today was the product of fear and sloppy science rather than empirically sound study, this Court has discretion to vary from the prescribed Guideline offense levels.

Taking into account the actual harms of MDMA, this Court should begin with a sentencing range of 0 to 6 months before considering Mr. Reed's individual circumstances under 18 U.S.C. § 3553(a). Alternatively, if this Court wishes to do no more than reverse the effects of the flawed 2001 Guideline, it should begin with a sentencing range of 30 to 37 months. Either way, it is vital that this Court exercise its independent judgment to preserve fairness and ensure that the resulting sentence for Mr. Reed is "sufficient but not greater than necessary" to serve the goals of sentencing. 18 U.S.C. § 3553(a). Once this Court has identified a fair and realistic

---

WL1991146 (S.D.N.Y. May 19, 2011).
[72] *Gall*, 552 U.S. at 49-50; *see also United States v. Lewis*, 623 F. Supp. 2d 42, 47 (D.D.C. 2009) (stating that categorical policy disagreements should be applied before individual considerations); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1107-08 (N.D. Iowa 2009) (applying categorical policy disagreement before adjusting for individual circumstances); *accord*, *United States v. Greer*, 699 F. Supp. 2d 876, 880 (E.D. Tex. 2010); *United States v. Edwards*, 693 F. Supp. 2d 575, 582-84 (S.D. W. Va. 2010); *United States v. Williams*, No. 09-CR-30099, 2010 WL 1325229, at *8 (S.D. Ill. Mar. 30, 2010); *Henderson v. United States*, 660 F. Supp. 2d 751, 753-54 (E.D. La. 2009); *United States v. Dozier*, No. S1 08 Cr. 08-02, 2009 WL 1286486, at *6-7 (S.D.N.Y. May 8, 2009).

Guideline range, it should address Mr. Phan's individualized circumstances as discussed in the previously submitted sentencing memorandum from, as required under § 3553(a).

RESPECTFULLY SUBMITTED this 3rd day of September, 2015.

      /s/ Rudy J. Bautista
      Rudy J. Bautista
      Attorney for Mr. Reed

## CERTIFICATE OF SERVICE

On this 3rd day of September, 2015, I delivered a true and correct copy of the foregoing by filing in the CM/ECF system to:

Vernon Stejskal
AUSA
185 South State Street, Ste. 400
Salt Lake City, UT 84111

      /s/ Julie Sorensen